UNITED STATES of America, Plaintiff-Appellee,

v.

John Grant PASSMORE, Defendant-Appellant.

No. 81–1240
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

April 1, 1982.
Rehearing Denied April 26, 1982.

Victor Sherman, Los Angeles, Cal., for defendant-appellant.

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., David B. Smith, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before RUBIN, SAM D. JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Passmore appeals from the district court's order denying his motion to dismiss the indictment against him on grounds of double jeopardy. We affirm.

Passmore and John Dorr were charged with, and following a trial by jury convicted of, conspiracy to import marihuana into the United States from the Republic of Mexico, conspiring to possess marihuana with intent to distribute it, and aiding and abetting themselves and other conspirators in the commission of such offenses. Passmore and Dorr appealed, and this Court, holding that a portion of the prosecution's closing jury argument was improper and prejudicial, reversed the convictions and remanded the case for a new trial. *United States v. Dorr*, 636 F.2d 117 (5th Cir. 1981). Following reversal and prior to retrial, Dorr pleaded guilty. Appellant Passmore filed a motion to dismiss the indictment, alleging that the prosecution was guilty of intentional or grossly negligent misconduct in the prior trial by its closing jury argument and by its introduction in evidence of the plea bargaining agreements of its witnesses, the co-conspirators Halteman and Gonzalez, and that a retrial was therefore barred on double jeopardy grounds. The motion was submitted to Judge D. W. Suttle, who presided at the first trial, and by agreement of the government and Passmore was considered on the basis of the transcript of the first trial without the taking of further evidence.

In his memorandum opinion denying the motion to dismiss, Judge Suttle noted that although this case involved a second prosecution following appellate reversal, he would rule on the motion under the standards applicable to cases in which the initial prosecution was terminated by mistrial. He noted that under this Court's opinions in *United States v. Charette*, 625 F.2d 57 (5th Cir. 1980), and related cases, a mistrial granted on the defendant's motion bars a second trial if, but only if, considering "[t]he totality of the circumstances" there is "gross negligence or intentional misconduct on the part of the Government which has seriously prejudiced the defendant." Applying this standard, Judge Suttle stated that "[f]rom an examination of the totality of the circumstances, this court finds that the prosecutor did not act in bad faith" and:

> "The prosecutor did not make his prejudicial remarks intentionally or as a result of gross negligence; rather, he made the remarks inadvertently, without any bad purpose in mind. The prosecutor did not deliberately make the remarks to prejudice the defendant; he made them in the heat of argument as a rebuttal to the defense attacks on his chief witness's credibility."[1]

In our view appellant was not entitled to have the motion to dismiss passed on under any standards more favorable to him than those the district court employed, and indeed appellant does not question the district court's view of the law in this regard. Instead, Passmore insists that, contrary to

---

1. Although Judge Suttle, responding to the directions in *United States v. Dunbar*, 611 F.2d 985, 988 (5th Cir. 1980) (en banc), *on remand to panel*, 614 F.2d 39 (5th Cir.), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980), made a finding that the double jeopardy motion was frivolous, he nevertheless stayed the retrial pending the present appeal because the government and defense had agreed to such procedure.

the district court's findings, the transcript of the first trial plainly establishes intentional or grossly negligent prosecutorial misconduct seriously prejudicial to him. In these circumstances, we must affirm the district court unless, on review of the record as a whole, we determine that its referenced findings are "clearly erroneous." *United States v. Charette*, 625 F.2d 57, 58 (5th Cir. 1980); *United States v. Luttrell*, 609 F.2d 1190, 1192 (5th Cir. 1980); *United States v. Davis*, 589 F.2d 904, 906 (5th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Crouch*, 566 F.2d 1311, 1318 (5th Cir. 1978). As we agree with the government that the district court's findings are not clearly erroneous, its denial of the motion to dismiss is affirmed for that reason. Accordingly, we do not reach the government's other contentions though they raise serious questions of double jeopardy law.[2]

■ The sole basis for reversal of the conviction of appellant and Dorr was the following portion of the closing rebuttal argument to the jury made by Assistant United States Attorney Murphy, who tried the case for the government:

> "They would also have you believe, ladies and gentlemen, that this entire conspiracy was cooked up by Mr. Fagan, a conspiracy to get these men, and it was aided and abetted by Mr. Whitworth [DEA agent] and myself. And I believe Mr. Sherman [counsel for Passmore] told you that a Court in this United States can do whatever they want [sic] and he would never question that. Look at the transcript of that proceeding where Mr. Fagan was sentenced when the Judge says, 'You have done what I asked you to do.' That's Judge Sneed [District Judge for the State of New Mexico who accepted Fagan's guilty plea in state court].

> Look at the plea agreements of Mr. Halteman and Miss Gonzalez in which it says [sic], 'The Court,' that means the Judge, 'must decide if these agreements are in the interest of justice and has the sole discretion.' The Court has the discretion not to accept them.

> "I would have to assume then, ladies and gentlemen, that Mr. Sherman and Mr. Nicholas and Mr. Barrera [defense counsel for Dorr] feel that this Court, Judge Suttle and the Judge up in Rosswell [sic], New Mexico are all out to get their clients. Does that make sense? Does that appeal to your reason? Does that appeal to your common sense?" [*United States v. Dorr*, 636 F.2d at 119–20.]

Halteman, Gonzalez, and Fagan, though Fagan was not named a defendant, were alleged in the indictment as being co-conspirators with Dorr and Passmore, and each testified for the government, Fagan being its main witness and Halteman an important one. Gonzalez, some seven weeks before trial, and Halteman, a few days prior to trial, were allowed by Judge Suttle to plead guilty to superseding misdemeanor informations. Pursuant to their written agreements with Assistant United States Attorney Murphy, they undertook to cooperate in the investigation, give a truthful statement, and testify if called. The government agreed that if the court accepted the pleas and Gonzalez and Halteman cooperated as promised, then at the time of sentencing on the misdemeanor the felony indictment would be dismissed. If the court did not accept the agreements as being in the best interest of justice the pleas could be withdrawn and statements made under the agreements would not be used against them.

---

**2.** Specifically, the government asks us (i) to disavow our language in *United States v. Kessler*, 530 F.2d 1246, 1256 (5th Cir. 1976), indicating that prosecutorial "gross negligence," as well as "intentional" misconduct, may suffice to bar retrial; (ii) to hold that where the retrial for prosecutorial misconduct results from appellate reversal, rather than a mistrial during the initial proceeding, double jeopardy does not bar the second proceeding unless the prosecutor's wrongdoing is not discovered until after the first trial is complete; and alternatively, (iii) to decline (presumably on grounds analogous to "law of the case") to apply double jeopardy in any case of reversal for prosecutorial misconduct where the appellate court did not expressly direct that the charges be dismissed.

Fagan had pleaded guilty in New Mexico state court to drug offenses arising out of a portion of the course of conduct charged in the indictment. While sentencing was pending on this plea, Drug Enforcement Administration [DEA] agent Whitworth and New Mexico officer Adams (both also government witnesses in the trial) informed Judge Sneed, the New Mexico state district judge, of the potential benefit of Fagan's cooperation. Judge Sneed gave the agents to understand that if Fagan cooperated he would not sentence him to the penitentiary. Upon this information being relayed by the agents to Fagan, and an oral agreement being made between Fagan and Assistant United States Attorney Murphy that if he cooperated in the investigation he would not be federally prosecuted, Fagan testified before the grand jury which returned the instant indictment. This was reported to Judge Sneed who thereafter sentenced Fagan to three years' probation, the probation being transferred to Texas. The plea bargain agreements of Halteman and Gonzalez, and cover letters from Murphy transmitting them to Judge Suttle, were introduced in evidence. Also admitted in evidence was a letter from Judge Sneed to Judge Suttle explaining the former's handling of Fagan's case, and a transcript of the proceedings at Fagan's sentencing by Judge Sneed.

In holding the above-quoted argument of the prosecutor to be reversible error, this Court stated:

"In the present case, we may have found no difficulty with the prosecutor's closing argument if he had merely questioned the reasonableness of a conspiracy between the DEA agents, the prosecutor and the government witness, since defense counsel had suggested such a possibility. Defense counsel, however, never implicated either the New Mexico state judge who accepted Fagan's plea of guilty or the federal district judge. Nonetheless, the prosecutor discussed the state judge's reasons for accepting Fagan's plea bargain agreement although there was no testimony of the judge's reasons for accepting it. The prosecutor

also went so far as to suggest to the jury that defense counsel was contending that both judges were involved in a conspiracy to convict the appellants. No such argument by defense counsel was ever presented.

" . . . .

" . . . The first part of the prosecutor's argument could very well have suggested to the jury that since a state judge accepted Fagan's plea, his story must be considered as true *ab initio*, thus supplanting the jury's choice on credibility for that of the judge's. The second part of the challenged portion of the argument was overly prejudicial because it inserted a factor, that of a conspiracy between the judges against Dorr and Passmore, which did not exist in the case at all.

" . . . In light of the prosecutor's reference to a nonexistent defense theory of both state and federal judicial conspiratorial involvement, Halteman's testimony has also been tainted by the prosecutor's remarks. For the foregoing reasons, we find that the prosecutorial misconduct in this case requires the granting of a new trial for both defendants." *Id.* at 120–21.

Our review of the record leads us to the firm conclusion that Judge Suttle's findings on the motion to dismiss are not "clearly erroneous." As noted, evaluation of the prosecutor's complained of conduct must be made in light of the totality of the circumstances. Of special significance here is the manner in which the subject of the plea bargains of the government witnesses Halteman, Gonzalez, and Fagan, and Fagan's sentencing, were developed and utilized by counsel for the respective parties over the course of the trial.

At the beginning of trial, the prosecutor in his opening statement made but one reference to the plea bargains, a brief concluding sentence stating that he expected the defense to show that the government's anticipated witnesses Fagan, Halteman, and Gonzalez "have made agreements with the Government and they are testifying here

pursuant to that agreement." Passmore's counsel in his opening statement, made just following that of the prosecution, asserted that

> "[t]he Government made certain recommendations to the Judge in New Mexico so that Mr. Fagan would not have to go to jail. They made promises to him that they would not prosecute him . . . and they also agreed not to do anything to bring to the attention of the Mexican authorities . . . this person that he killed . . . ."

He further stated that since the prosecution did not believe that any jury would credit Fagan's testimony, they also offered "deals" to Halteman and Gonzalez which required these witnesses, in order to have the felony charges against them dismissed, to "get upon the stand and corroborate what Mr. Fagan has told them." This at the very least inferred that the agreement required the witnesses to testify to a specific version of the events in question, as opposed to merely requiring them to testify according to their knowledge.

In the prosecution's direct examination of Fagan, it was brought out that DEA age.it Whitworth had told Fagan that if Fagan cooperated Whitworth "would do what he could with the State of New Mexico," that Fagan's only agreement with the Assistant United States Attorney was an oral promise that "I would not be charged federally," and that Fagan's initial counsel in the New Mexico case was paid by Dorr. However, no details of the ultimate New Mexico disposition were developed nor was any reference made to the New Mexico judge. The defense unsuccessfully objected to this evidence of the government agreement with Fagan on the ground that "we are entitled to have cross examination bring this out rather than the prosecution," and refused to say that they did not intend to go into this subject on cross-examination.

In initial cross-examination of Fagan, the defense heavily emphasized Fagan's "deal" with the government and the course of the proceedings in New Mexico. Additionally, both Dorr's and Passmore's counsel sought to stress the fact that Fagan did not tell the New Mexico judge about the accident in Mexico when the smuggling plane Fagan was landing struck and killed a bystander. They also emphasized that prior to testifying before the grand jury Fagan had been informed that the New Mexico judge had said that if Fagan testified the judge would not sentence him to the penitentiary. Neither of these matters had previously been put in evidence.

The next witness relevant in this connection was New Mexico police officer Adams. On direct examination of Adams by the prosecution none of these matters were gone into, as Adams simply testified to the circumstances of Fagan's arrest in New Mexico and the discovery of marihuana in the plane he had just been piloting. On cross-examination of Adams, Dorr's counsel brought out that Adams and Whitworth had prevailed on Judge Sneed to authorize them to tell Fagan that if he testified before the grand jury the judge would not sentence him to prison, that Fagan was so informed and did testify, and that this was related to Judge Sneed who then gave Fagan a three-year probated sentence. Dorr's counsel then introduced into evidence, without any objection from either Passmore's counsel or the government, a letter from Judge Sneed to Judge Suttle setting out the history of Fagan's New Mexico case and a transcript of the New Mexico proceedings. This transcript introduced by the defense contains the following respecting Fagan's final sentencing in New Mexico on March 19, 1979, after he had testified before the grand jury:

> "THE COURT: Okay. The Defendant, Terry Fagan . . . is before the Court for completion of sentence at this time. I received a pre-sentence report on Mr. Fagan indicating that he should be confined in the Penitentiary. Subsequent to that, I made a deal with him, and I have been advised that *you kept your end of the deal, and I am going to keep mine,* Mr. Fagan.
>
> "MR. FAGAN: (Nods head affirmatively).

"THE COURT: And, my deal was that *I would not put you in the Penitentiary on this deal, if you would do what I asked you to do.* So, it will be the judgment and sentence of the Court, that sentence be deferred in your case, and you are released on probation for a period of three years .... The Probation Office can and will arrange for the transfer of your probation ...." [Emphasis added.] Obviously, the emphasized portion of the foregoing is what the prosecutor was referring to in the third sentence of that part of his closing argument quoted earlier in this opinion.

On cross-examination of Adams by Passmore's counsel, the specifics of the "deal" with Judge Sneed were again extensively explored. It was also brought out that the agents were aware of the landing incident in which the Mexican National was killed when they took Fagan's statement on January 18, 1979, though the statement does not refer to it.

The next witness was DEA agent Whitworth. He was examined by the prosecution in relation to his initial contact with Fagan and the agreement he made with Fagan which was approved by prosecutor Murphy. This agreement was that if Fagan cooperated and testified concerning the marihuana in the plane he was piloting on the occasion of his arrest he would not be federally prosecuted and Whitworth would intercede on his behalf with Judge Sneed. Whitworth additionally testified to the meeting at which Judge Sneed indicated he would not sentence Fagan to prison if Fagan testified before the grand jury, and that Fagan, after being informed of Judge Sneed's attitude in the matter, did in fact appear before the grand jury. Whitworth confirmed that he knew of the Mexican National's death when Fagan's January 18 statement was taken.

On cross-examination by Dorr's counsel, Whitworth was asked several questions based on the letter from Judge Sneed to Judge Suttle. Dorr's counsel then, without any objection by Passmore's counsel, went into the plea bargains of Gonzalez and

Halteman, a subject which had *not* previously been put in evidence. Whitworth answered affirmatively when asked if it were not true that Gonzalez "has plea-bargained herself ... from a felony to a misdemeanor," that Halteman "plea bargained through you and Mr. Murphy from a felony in this indictment ... to a little bitty misdemeanor," that "they are in the wings awaiting being called as a Government witness," and that "the consideration for the misdemeanor plea bargain ... was that they testify for the Government if called." Immediately thereafter Dorr's counsel continued as follows:

"Q. And that plea bargain was accepted by *this Court*?

"A. Yes, sir.

"Q. Is that correct? Or otherwise, they couldn't have done it?

"A. That's correct.

"Q. Any plea bargain entered with any Defendant is always *subject to the approval of the District Court Judge where the case is pending*, is it not?

"A. For it to be effective, yes, sir.

"Q. All right. Now—otherwise, you couldn't have a misdemeanor plea. Correct? If the Judge didn't approve it, you couldn't have a misdemeanor plea and you couldn't make a plea bargain.

"A. If your original count was a felony, you are correct.

"Q. And the original count in Halteman's case, in Vivian Gonzalez's case is a felony as charged in the indictment on trial before this trial jury?

"A. That is correct." [Emphasis added.]

It was thus *the defense* that *first* brought up the matter of Judge Suttle's connection with the Gonzalez and Halteman plea bargains. It was the defense that strove to make unmistakably clear that these plea bargains, which the immediately previous questions had shown were in consideration of these potential witnesses agreeing to give testimony if called, were in fact approved by Judge Suttle. Shortly after the

above-quoted testimony, the following questions by Dorr's counsel and answers by Whitworth appear:

"Q. Now, Gregory Mark Halteman who has been permitted to plead guilty to a misdemeanor, according to what you have just testified to in this Court, is also the same Gregory Mark Halteman that had already brought in, through his pilot, some 14 loads of marijuana, isn't that correct?

"A. There are allegations contained in at least two statements we had that he had brought in several loads of marijuana. And I don't know how many he brought in personally.

"Q. Do not your allegations in your official DEA reports and Government records ... state ... that Mr. Halteman, that is, Gregory Mark Halteman, stood in an airstrip in Mexico and watched his pilot take off, crash, burn and die with a load of marijuana?

"A. That is correct.

"Q. And that was I think his fifteenth load before he took off, burned, crashed and died.

"A. I think it was alleged that it was the thirteenth load.

"Q. And that's the same Halteman that has been allowed to plead guilty to a misdemeanor.

"A. That is correct."

Thus, the defense made the Halteman plea bargain, which it had just shown was approved by Judge Suttle, appear to be overly generous and hence unjust if not improper. In other parts of his cross-examination of Whitworth, Dorr's counsel attempted to insinuate that Whitworth and Murphy had deliberately and wrongfully caused the grand jury testimony of Fagan and Whitworth not to be recorded.

Cross-examination of Whitworth by Passmore's counsel was also largely concerned with the plea bargains. It was again brought out that Judge Sneed deferred his sentencing of Fagan to see if he cooperated,

but that when he finally sentenced him the judge was unaware of the incident in which the Mexican National was killed. Counsel did bring out that a month or six weeks before trial Murphy was unaware of this killing. Nevertheless, it was repeatedly suggested that not only had the DEA wrongfully withheld this and other information from the New Mexico judge and the grand jury, but also that the DEA *and* Murphy had offered Halteman a "deal," despite knowing of his extensive wrongdoing apart from the events charged in the indictment, because they believed the jury would not credit Fagan's testimony. Counsel also sought to establish that the DEA and Murphy deliberately kept from Judge Suttle, when he accepted Halteman's plea, evidence of the latter's extensive wrongdoing.

The defense thus plainly raised the subject of what was in the mind of Judge Sneed when he sentenced Fagan and what was in the mind of Judge Suttle when Halteman came before him to enter his plea.

The next government witness, Vivian Gonzalez, was not asked anything about her plea agreement until near the end of her direct examination when she testified she had entered into a written agreement with the government and was represented by an attorney. Counsel for Passmore then requested a bench conference and objected "to the plea agreement being put in before the jury." The court furnished the written agreement to defense counsel, and counsel for Dorr said they had no objection. However, when Murphy indicated he might only question the witness about it rather than introduce the agreement itself, the court stated, "there are no objections from the other side" and Dorr's counsel said, "we would request that Mr. Murphy read it to the jury." The court then announced, "All right. If there is no objection, I will mark it as an exhibit. Prove it up and go ahead and introduce it." At no time did Passmore's counsel renew his initial objection. The government, after some further preliminary questioning, then proceeded to read in

evidence the plea agreement signed by Gonzalez and Murphy and the cover letter transmitting it to Judge Suttle.

Halteman's testimony came just following that of Gonzalez. In the latter portion of his direct testimony Halteman testified he had made an agreement with the government and described its general terms, all without objection by the defense. The prosecution then indicated it would introduce the written agreement, to which Passmore's counsel made vigorous objection on the ground that it was self-serving and insinuated that the government was vouching for what the witness would testify to. The government replied that the defense had opened up this area of inquiry. The court overruled Passmore's objection. No objection was made by Dorr's counsel. The prosecution then proceeded to read in evidence the plea agreement signed by Halteman and Murphy and the cover letter sending it to Judge Suttle. No party made any objection to the cover letter as such or raised the contention that it or the agreement was inadmissible because of references to the judge or the fact that the documents disclosed the plea bargain was to be approved by him. Cross-examination by counsel for Dorr and Passmore delved extensively into Halteman's prior misdeeds and into the fact that he told the agents about them but they were not included in his written statement concerning this offense. Halteman was extensively examined about his "deal" and the fact that "the Government," meaning "Mr. Murphy," wanted him to testify in this case and made the "deal" with him to get his testimony.

Subsequently Fagan was recalled for further cross-examination, which centered largely on his "night on the town" with DEA agents during the course of the trial.

Although several other witnesses testified for the prosecution and the defense, including Dorr, the testimony of these other witnesses did not materially involve the plea bargains of Halteman or Gonzalez or Fagan's "deal" or his sentencing by Judge Sneed. Passmore did not testify.

Our review of the record thus shows that, from the opening statements to the jury through the close of the evidence, the defense vigorously attacked the credibility of Fagan and Halteman, pointing to their unsavory characters and records, their plea bargains and the supposed gross impropriety and unfairness of them getting off so lightly. The defense in effect charged that the DEA wrongfully withheld important information from Judge Sneed in relation to his sentencing of Fagan, especially information as to Fagan's personal use of drugs and the landing accident in which the Mexican National was killed. It was further claimed that the DEA *and* Assistant United States Attorney Murphy wrongfully withheld information, as to Halteman's extensive prior involvement in other drug smuggling and the fact that in one of these incidents a pilot lost his life, from Judge Suttle in regard to his approval of Halteman's plea bargain. The defense also charged the DEA with improper fraternization with Fagan, and the DEA and Murphy with wrongfully failing to have the grand jury testimony recorded. In effect, they asserted a conspiracy by Fagan, the DEA and, at least to some extent, Murphy, to "get" Dorr and Passmore.

Not only were the plea bargains of the witnesses a major theme of the entire defense presentation, but it was the accused who first sought to show both the substance of those agreements and the involvement of Judges Sneed and Suttle. The fact that a judge, and that the judge was Judge Suttle, approved the plea bargains of Gonzalez and Halteman was first brought out by the defense. It was the defense which introduced the transcript of Judge Sneed's remarks on the sentencing of Fagan. The subjects of what was in the minds of Judges Sneed and Suttle when they acted on the plea bargains or sentencing, why they acted as they did, and whether such actions were appropriate, were each matters first raised by the defense. In contrast, the prosecution, during the course of trial, made reference to and developed evidence concerning these matters in an essentially defensive posture—to avoid being in a position where the accused

could make it appear to the jury that the prosecution was attempting to conceal the plea bargains from them, and to counter the defense insinuations that the plea bargains were improper or corrupt. The prosecution's stance does not reflect an attempt to affirmatively bolster the witnesses' testimony by arguing that their pleas and the circumstances surrounding them made it more likely that their testimony was truthful than if they had made no plea bargain agreements.

This, then, was the posture of the case when the evidence closed and the final jury arguments were to be made.

No complaint is made of the prosecution's opening argument to the jury. It repeats several times that the argument of counsel "is not evidence and it is not the law" and stresses that the jury should be guided by their recollection of the evidence and their view of what in it is important, as opposed to what counsel says in argument. It stresses that the indictment is not evidence and that the burden of proof is always on the government. The prosecution then reviews in detail the evidence against Dorr and Passmore. The entire argument runs some 18 pages in the record, and makes no mention of Judges Sneed or Suttle or of the plea bargains of Halteman or Gonzalez. The only mention of either Fagan's "deal" or sentencing is a brief reference at the end of the argument to the fact that Fagan,

"entered into an agreement with the State of New Mexico to plead guilty. He pled guilty, but before being sentenced he talked to Mr. Whitworth and Mr. Alcorn of the DEA and he then entered into an agreement to testify and that's how this case got here, ladies and gentlemen."

The defense's closing arguments occupy some 73 pages in the transcript. Counsel for Dorr and Passmore devoted a large part of their arguments to a bitter attack on Fagan and Halteman, the plea bargains, the DEA and "the Government." Dorr's counsel asked the jury, in effect, to judge the evidence against Dorr and Passmore as if they were "one of your children or your parents." He suggested to the jury that

the DEA was out to get Dorr because "he is an important man," that there was "bias and/or prejudice against Mr. Dorr" by Fagan and the DEA, and that they deliberately didn't give Fagan a lie detector test. Counsel claimed the DEA improperly had a "night on the town" with Fagan during the trial and stated, "I want the prosecution to please tell us why they would do such a thing . . . it does our Government discredit that we should have people of that type." It was argued that "the Government" caused Gonzalez to be indicted when she was not guilty of anything for the purpose of procuring her testimony under threat of prosecution. The argument also asserted that because of the DEA the facts "were not made available to that Judge in New Mexico"; that the DEA "obscured the facts . . . from a Judge in New Mexico"; and that "they" withheld information from the grand jury and did "carry this alleged scheme to a conclusion in August" by making the deal with Halteman.

The argument of Passmore's counsel followed and was much in the same vein. Like counsel for Dorr, he went into considerable detail about and heavily criticized Fagan's "night on the town" with the DEA agents. He chastised "the Government," plainly meaning Mr. Murphy, for implying that Passmore's character witnesses testified as a favor to his parents, and commented that "the Government seems to be getting so desperate" and "Mr. Murphy's insinuations are like his other insinuations in this case, totally without foundation." He complained that information was wrongfully withheld from the grand jury and asserted, "I don't think the Drug Enforcement Administration or Government in this case has acted in a fair manner." He stated that he would not have "spent two weeks away from California [his home] in San Antonio [where the case was tried] unless I thought this was an important matter." Counsel again attacked the Halteman plea bargain, claiming Halteman "was being given this incredible deal by the Government for apparently for no apparent purpose," and specifically remarked that

"this of course is the plea agreement which was sent to Judge Suttle on August 21 and it was sent to the Judge by John E. Murphy, the prosecutor in this case." He complained about Fagan's sentencing and information being withheld from Judge Sneed, then asked, "Did the Government mislead Judge Sneed in this case?" and stated:

"Judge Sneed very well might have given Mr. Fagan probation anyhow. He might have had his reasons. He might have been convinced that Fagan was the greatest thing that ever happened to the DEA and he deserved to get probation. That is up to Judge Sneed. I don't know the man and if that's what he wanted to do, *the Courts in this country can do whatever they want.* I have no objection, but do you think it was fair not to at least inform him of the facts? They knew it. . . .

"Is that fair? Was that fair to that man? Do you think if we asked or called Judge Sneed on the telephone now and brought to his attention all of these other factors, that he might at least think about having a change of heart? But that's how they conducted themselves in this particular case." [Emphasis added.]

The emphasized portion of the foregoing is clearly what the prosecutor was referring to in the second sentence of the portion of his rebuttal argument quoted earlier in this opinion.

Thereafter came the rebuttal argument of the prosecutor, covering some 17 pages in the transcript, during which the Assistant United States Attorney made the improper remarks, quoted earlier in this opinion, which led to this Court's reversal of the convictions of Dorr and Passmore. These remarks were made at the conclusion of some nine days of a trial which appears, from the cold record before us, to have been contested not only ably and vigorously, but indeed hotly and bitterly, by experienced and capable defense counsel. While the remarks of the prosecutor were improper and went beyond the scope of the preceding closing arguments for the defense, nevertheless, these objectionable statements appear to have been made in the flush of hasty reaction to the just concluded biting and often personal attack of counsel for the accused, rather than to have been the product of the prosecutor's premeditated calculation. Moreover, these remarks are in the nature of defensive counters rather than attempts to affirmatively demonstrate the accused's guilt.

As noted, this Court found essentially two vices in the prosecution's argument. The first was that it suggested that Judge Sneed had found Fagan's testimony to be truthful. The second was that it raised a false issue by inferring that a part of the accused's defense was that Judges Sneed and Suttle conspired against them. Since the evidence showed Halteman's plea bargain had been submitted to Judge Suttle, this Court also found the argument prejudicial in regard to the jury's consideration of Halteman's testimony, as well as Fagan's. *United States v. Dorr,* 636 F.2d at 121. We do not question or doubt that the argument was improper for these reasons. Nevertheless, the issue we now address is not whether this argument constituted prosecutorial misconduct, for which cases have long been reversed and then retried [*see Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1, 12 (1978)], but is rather whether the district court which tried the case was clearly erroneous in its finding that such misconduct was neither intentional nor grossly negligent. As to this question, it is certainly relevant that the prosecutor may have felt in good faith, and not entirely without reason, that he was entitled to mention what Judge Sneed said at Fagan's sentencing, as the defense had first put this in evidence and had in closing argument extensively speculated as to Judge Sneed's mental processes in sentencing Fagan. The prosecutor was wrong, and an error of judgment was made, for an impermissible inference arose that Judge Sneed was vouching for the credibility of Fagan's present testimony. But not every error in judgment constitutes negligence, much less gross negligence or intentional misconduct. *See United States v. Opager,* 616 F.2d 231, 236 n. 13 (5th Cir. 1980).

Moreover, it also can easily be understood how the prosecutor, in good faith and again not totally without reason, may have considered that he was not barred from referring to Judge Suttle's acceptance of the plea bargains. Inasmuch as it was the defense which had initially put in evidence that Halteman's and Gonzalez's plea bargains had to be accepted by a judge and that it was Judge Suttle who did so, and as it was the defense which first raised Judge Suttle's name in this connection in closing arguments, the prosecutor's reaction in closing rebuttal is understandable.

A perhaps more evident error in the argument was the claim that the defense was asserting that Judges Sneed and Suttle were out to get Dorr and Passmore. This was not what the defense argued. But the defense was clearly critical of the leniency Fagan and Halteman received, of the treatment of Ms. Gonzalez, and of the use of plea bargains to produce agreements to testify where the witnesses remained under threat of prosecution. While it is true that the defense contended material information was withheld from the judges, it is also clear that the judges were not totally "in the dark." There was no hint any false information was given them and they knew persons indicted for serious felonies were being allowed to plead to misdemeanors in return for giving testimony in this case. So, it could be argued with some validity that the defendants' contentions, when logically extended, amounted to a criticism of the actions of the judges. Given that the defense also argued a conspiracy between the prosecution and the DEA (as this Court's opinion on the prior appeal recognized), the overreaction of the prosecution to this argument, by saying, "I would have to assume . . . that [defense counsel] . . . feel that . . . Judge Suttle and the Judge up in Rosswell [sic], New Mexico are all out to get their clients," can fairly be judged as no more than simple negligence. As such it is insufficient to bar retrial. *Lee v. United States*, 432 U.S. 23, 32–34, 97 S.Ct. 2141, 2146–47, 53 L.Ed.2d 80, 88–89, (1977); *United States v. Crouch*, 566 F.2d at 1318, n. 9; *United States v. Garza*, 603 F.2d 578, 580 n. 3 (5th Cir. 1979).

Also relevant to an assessment of whether the prosecutor's argument amounted to intentional or grossly negligent misconduct is the fact that the district judge not only overruled the defense motion for mistrial based on the argument, but also denied the defense request for a curative instruction. As noted, this Court, on the prior appeal, held that the district court erred in so ruling. Nevertheless, it appears that Judge Suttle, who did not have the opportunity to carefully read over the transcript of the trial and the closing arguments before making his ruling, was then of the opinion that the argument was permissible. Although we lay down no "bright line" test in this regard, it is difficult for us to see how an attorney can be held to have engaged in intentional or grossly negligent misconduct by doing what the federal district judge trying the case has ruled he had a right to do. At least this is true where, as here, counsel had not misled the judge and there is no suggestion the judge is guilty of intentional or grossly negligent misconduct. Further, we deem it relevant that this Court's opinion on the prior appeal contains no hint that it considered the prosecutor's misconduct to have been either intentional or grossly negligent. *See United States v. Opager*, 616 F.2d at 237. Moreover, the prior opinion was at pains to point out that:

> ". . . the motions for mistrial and request for curative instructions had all been made in sufficient time to allow the judge to correct any error if he had chosen to do so. The plain error rule is thus not applicable.
>
> ". . . .
>
> "In determining the overall degree of prejudice in a prosecutor's closing argument, an appellate court may consider the district court's jury instruction . . . . In the instant case, the district judge refused to give a curative instruction . . . ."
> [*United States v. Dorr*, 636 F.2d at 120–21.]

We infer from this that this Court on the prior appeal considered there was at least a substantial likelihood a proper instruction would have effectively corrected the prosecutor's error so that a mistrial would not

have been necessary. We concur with this assessment. In this situation, to sustain a plea of double jeopardy, at least where the trial judge's ruling denying what would have been an efficacious curative instruction does not result from some intentionally misleading act of the prosecutor, would prevent most retrials following reversals and would go well beyond the "forced motion for mistrial" rationale of the decisions applying the double jeopardy bar to retrials necessitated by prosecutorial misconduct. *See United States v. Kessler*, 530 F.2d 1246, 1258 (5th Cir. 1976); *United States v. Barham*, 608 F.2d 602, 604 (5th Cir. 1979), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981).

Had this Court on the prior appeal felt that the prosecutor's misconduct was so egregious as to bar a retrial, it could have ordered the charges dismissed. *See* 28 U.S.C. § 2106 (1976). It not only failed to do so, but indeed affirmatively stated that its reversal and remand was "for a new trial." 636 F.2d at 121. And this was the precise relief Passmore had requested on the prior appeal. We note these matters simply as being corroborative of our independently arrived at conclusion that the district court's findings, that the prosecutor was guilty of no intentional or grossly negligent misconduct, are not clearly erroneous.[3]

Passmore's other claims of prosecutorial misconduct sufficient to bar retrial we find totally without merit.[4]

The district court's findings, quoted above, are not clearly erroneous. To the

---

**3.** Specifically, there is no occasion for us to, and we do not, determine whether Passmore's prior request for a "remand for a new trial" is any kind of waiver of his right to now claim, on the basis of the same record, that a retrial is barred by double jeopardy. *Compare Burks v. United States*, 437 U.S. 1, 17–18, 98 S.Ct. 2141, 2150–51, 57 L.Ed.2d 1, 13–14. We also do not determine whether this Court's prior order for a new trial, when it could have ordered a dismissal, prevents us, were we otherwise of mind to, from now holding, on the basis of the same record, such a retrial to be impermissible.

**4.** Passmore contends that the admission in evidence of the Halteman and Gonzalez plea bargain agreements and cover letters to Judge Suttle was held to be error on the prior appeal and constitutes prosecutorial misconduct. This Court did not so hold on the prior appeal, as it specifically stated, "we find no errors in the evidentiary rulings." *United States v. Dorr*, 636 F.2d at 121. The reference in the opinion to Halteman's plea bargain agreement and the cover letter to Judge Suttle being in evidence was merely to demonstrate how the prosecutor's improper jury argument was potentially prejudicial in respect to the jury's evaluation of Halteman's testimony; nowhere does the opinion state that the trial court erred by admitting these documents into evidence. Nor do we find that such was error. This was a subject the defense initially raised, first in the opening statement of Passmore's counsel by saying the Halteman and Gonzalez agreements required that their testimony be corroborative of Fagan's, and thereafter in cross-examination of Whitworth by Dorr's counsel where, without objection by Passmore's counsel, these agreements were again gone into and shown to be approved by Judge Suttle. The prosecution did not introduce the agreements until all this had transpired, and it was surely entitled in these circumstances to show what the agreements were. Even if this were error, the district judge, not being in any way misled, overruled the objections by Passmore, and so the prosecutor was merely doing what the district judge plainly allowed him to do. By no stretch of the imagination can the introduction of these plea bargain agreements and letters be considered any kind of intentional or grossly negligent misconduct.

Passmore also contends that other portions of the government's closing rebuttal argument constituted misconduct and evidence of the prosecutor's bad faith. The district court found that these matters were either not improper or were appropriate responses to defense arguments. These portions of the argument were not objected to, nor was any motion for mistrial or request for instructions made in respect to any of them. The opinion on the prior appeal contains no suggestion that any part of the prosecutor's closing argument was improper other than that quoted in that opinion and set forth above. These remarks were in some instances unexceptional in any context (such as calling attention to the fact that the defendant Dorr had a reason to fabricate and urging the jury to focus their attention on the issue of the accused's guilt rather than on the sexual adventures of Fagan or whether Fagan, Halteman or Gonzalez were treated too leniently), while in others (such as calling the defense presentation "garbage," urging the jury "don't let them mislead you," criticizing the defense for its attacks on the DEA and the prosecutor personally, and mention of personal opinion) were largely justifiable as responses to the arguments of the defense. If the bounds of prop-

contrary, they are fully supported by the record and we find no reason to disapprove them or reach a contrary determination. The prosecutorial misconduct present at the first trial does not rise to the level required to prevent retrial on double jeopardy grounds. *See United States v. Garza, supra; United States v. Crouch, supra; United States v. Charette, supra; United States v. Opager, supra; United States v. Fine*, 644 F.2d 1018 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981); *United States v. Romano*, 482 F.2d 1183 (5th Cir. 1973). Accordingly, the order of the district court denying appellant's motion to dismiss the indictment is affirmed.

AFFIRMED.

er reply were exceeded, any excess was not substantial and plainly appears to be the product of hasty reaction to the defense argument rather than of premeditated calculation. These remarks, considered in light of the totality of the circumstances, do not reflect intentional or grossly negligent prosecutorial misconduct either in themselves or in the statements which occasioned the prior reversal.

Finally, Passmore seems to urge that on the prior appeal this Court found "the government simply did not have sufficient evidence to warrant a conviction." The contention is frivolous. This Court plainly did *not* so find. And, if it had, it would have been obliged to order dismissal. *Burks v. United States, supra.* Indeed, neither Passmore nor Dorr even contended on the prior appeal that the evidence was not sufficient. Though the case against Passmore was not absolutely overwhelming, it was not weak and beyond any question it was sufficient. There was direct testimony from two witnesses, slightly corroborated by a third, of Passmore's active involvement in the offenses; and, unlike the case against Dorr, there was no evidence, other than character evidence, affirmatively showing that Passmore was not or could not have been so involved.